

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-10-00052-CR

CRAIG ARLEN MURRAH                                                                   APPELLANT

V.

THE STATE OF TEXAS                                                                          STATE

----------

## FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. Introduction

In five issues, Appellant Craig Arlen Murrah appeals his official oppression conviction. We reform the trial court's judgment and affirm as reformed.

### II. Factual and Procedural History

Murrah was a Fort Worth police officer when he was charged by indictment with official oppression.[2] The indictment contained ten paragraphs, but before

---

[1]*See* Tex. R. App. P. 47.4.

trial began, the State waived paragraphs 1, 2, 5, 6, 7, and 10, and it deleted some language from paragraphs 8 and 9. The language in the jury charge, however, reflects only paragraphs 3 and 4. The jury found Murrah guilty "as charged in the indictment," and the trial court's judgment states that Murrah was convicted of paragraphs 3, 4, 8, and 9. The trial court assessed punishment at six months' confinement and a $2,000 fine. This appeal followed.

### III. Judgment

In his first, second, and fifth issues, Murrah complains that the judgment incorrectly reflects that he was convicted of official oppression as alleged in paragraphs eight and nine because the jury was never charged on these paragraphs. The State agrees, and the record reflects this. Therefore, we sustain Murrah's first, second, and fifth issues and reform the judgment to reflect that Murrah was convicted of official oppression on paragraphs three and four.

### IV. Sufficiency of the Evidence

In his third issue, Murrah argues that the evidence is factually insufficient to support his conviction as alleged in paragraphs three and four of the indictment.[3] However, the court of criminal appeals has recently overruled

---

[2]Because Murrah challenges the sufficiency of the evidence to support his conviction, we will address the evidence below.

[3]Murrah also challenges the factual sufficiency of the evidence to support his conviction as alleged in paragraphs eight and nine of the indictment but, based on our resolution of his first, second, and fifth issues, we need not address this issue. *See* Tex. R. App. P. 47.1.

*Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), upon which the factual sufficiency standard of review is based, and decided "that the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). In the interests of justice, we will review Murrah's third issue under *Jackson*.

## A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the

3

evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

## B. Evidence

Corinna Mascorro testified that she was with Paul Botello, her children's father, on the night of June 21, 2007. Around 1 a.m., they drove to a nearby park and were engaging in sexual intercourse when another car pulled up. When they saw the headlights, they hurried to find their clothing. Someone—a police officer—knocked on the car window and asked for their identification; Botello could not find his initially, but Mascorro gave the officer hers. The officer asked her to step out of the car, and she asked if she could put her clothes on. He said no.

Mascorro emerged from the vehicle naked from the waist down; she grabbed Botello's shirt and put it around her waist. The officer escorted Mascorro to his patrol car and put her in the back seat while he ran warrant checks. He asked her whether she knew she could go to jail for having sex in the park. Mascorro testified that she started crying when she thought about

4

going to jail and leaving her children. The officer kept asking her if she had learned her lesson.

Botello testified that he was nervous when the officer approached their car because he knew he had outstanding warrants. After the officer had Mascorro step out of the car and moved his vehicle behind theirs,[4] Botello could not see anything.

The officer had Mascorro get back out of his patrol car and told her to turn around and put her hands behind her back. Botello's shirt, which she had been holding, fell to the ground. Mascorro testified that at that point, she thought that the officer was going to handcuff her and take her to jail. Instead, he told her to bend down and said that he did not think she had learned her lesson. Then he hit her with his hand, hard, "like four or five times on [her] bare butt." She asked him to stop, and he told her, "Quit being a drama queen."

Afterwards, the officer nudged Mascorro to go back to her car and returned her identification to her. She picked up Botello's shirt, walked back to her car, and told Botello what had happened. Enraged, Botello jumped out of the car to confront the officer, but "the cop drove off too fast." They followed the officer, calling 911 while in pursuit. When the officer pulled into a police station, they obtained his patrol car number and then drove back to Botello's house.

---

[4]Mascorro and Botello stated that during the incident, the officer changed the position of his patrol car so that it was behind their vehicle.

Botello stated that he stepped out of the car when he heard Mascorro crying. He approached the patrol car when the officer released Mascorro's hands, which were bound behind her back, and Mascorro ran towards him. As Botello approached, the officer—whom Botello identified as Murrah—put his hand on his weapon and told him not to take a step closer, then got into the patrol car and took off. Botello's 911 call was admitted in evidence and published to the jury. During cross-examination, Botello admitted that the first patrol car number that he gave the 911 dispatcher was different from the second time he gave the number, from "1059" to "1092."

A police supervisor, Corporal Lawrence Blanchard, subsequently called and spoke with both Mascorro and Botello. When Corporal Blanchard did not follow up with them within two or three weeks, Mascorro and her father went to the downtown police station and spoke with Sergeant Pablo Criado. Mascorro provided Sergeant Criado with a written statement, and he recorded his interview with her and showed her a photographic lineup, from which she identified Murrah.

Sergeant Criado described Mascorro's and her father's demeanors when they walked into the station to make the complaint: "Crying, she was crying. The father was really quiet, and you could read his body language that he was really upset and—to the point where they apprised me of the fact that they were looking for this officer." He interviewed Botello the next day and observed that their stories were consistent.

6

Corporal Blanchard testified that at the time of the incident, he was Murrah's supervisor. In the early morning hours of June 22, 2007, he received information that he "needed to call a citizen in reference to a complaint against . . . one of [his] officers. He spoke with Botello and Mascorro and then called Murrah. Murrah told him that he had had contact with Mascorro and Botello but denied their allegations.

Murrah's "Officer's Daily Activity Report" for the date of the offense was admitted during Corporal Blanchard's testimony. The report indicated that at 1:13 a.m., Murrah self-initiated an investigation. It also indicated that Murrah's vehicle that night was #1092. Corporal Blanchard testified that Murrah's vehicle was equipped with video equipment but that he did not recall reviewing the video. He reported the complaint about Murrah to his supervisor and then followed up with Botello, although it was "hit and miss." The complaint was addressed again two or three weeks later when Mascorro or Botello brought it to internal affairs.

Sergeant William Hix, who was working in internal affairs when Mascorro made her complaint, testified about police procedures taught for opposite sex encounters. He stated that if an officer encountered a nude or partially nude female, that person would be allowed to either get clothed or, if no clothing was available, to find something to cover herself up with, and that he "would suggest the first thing [an officer] should do is call somebody to come out there . . . to have another officer . . . to ensure that nothing unusual occurred." He explained that the Fort Worth police have an 800-page general orders book that includes a

7

code of conduct detailing the behavior expected of an officer. Under the code of conduct, officers are not allowed to mock, taunt, or humiliate those they come into contact with in the community. He replied, "No, never," when asked whether there was ever a time when officers are allowed to lay hands on detainees to enforce their own punishment as they see fit. And he stated, "I believe so," when asked whether "the manner and way [Murrah] treated [Mascorro] in spanking or striking her several times on her bare buttocks" was something that Murrah was taught was unlawful.

Sergeant Hix testified about Murrah's patrol vehicle's computer "CAD" log from June 22, 2007, which was entered in evidence. It reflected that at 1:17 a.m., Murrah requested from the dispatcher an investigative call—which can be anything more than a mere traffic stop—at 1500 East North Side Drive, approximately a mile away from the park. The request took him "out of service," i.e., unavailable for other calls. Sergeant Hix stated that when an officer is conducting an investigation or detaining a person, he is acting under the color of his employment as a police officer and acting in an official capacity.

The next CAD entry was for 1:19 a.m. and showed that Murrah checked Mascorro's and Botello's basic information. Sergeant Hix noted that Murrah's check on Mascorro's and Botello's personal information was unusually quick, which raised a red flag for him. Murrah's daily activity report confirmed that he had made contact with Mascorro and the time of the contact, but there was a "significant difference between the address that he documented to what they

8

reported." He testified that he never looked for CAD logs for patrol unit #1059 but that, based on his investigation, unit #1059 was not on duty that evening. And he testified that Corporal Blanchard told him that "there was no videotape or it wasn't captured on video" or that nothing relevant to the investigation was captured on video.

## C. Analysis

A public servant acting under color of his office or employment commits an offense if he intentionally subjects another to mistreatment that he knows is unlawful. Tex. Penal Code Ann. § 39.03(a)(1) (Vernon 2009). "Unlawful" means criminal or tortious or both. *Id.* § 1.07(48) (Vernon 2009). A public servant acts "under color of his office or employment" if he acts or purports to act in an official capacity or takes advantage of such actual or purported capacity. *Id.* § 39.03(b). The indictment alleged in paragraph 3 that Murrah mistreated Mascorro by holding her hands behind her back and causing her to bend over while she was partially clothed or naked, which he knew was unlawful, and in paragraph 4 that Murrah mistreated Mascorro by spanking or striking her with his hand on her bare buttocks, which he knew was unlawful. *See State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996) ("[A] defendant charged under [this section] must mistreat another and must also know that his conduct is criminal or tortious.").

The testimony at trial reflected that Murrah was a public servant—a police officer—acting under color of his office or employment when he made an

9

investigative stop. Viewed in the light most favorable to the prosecution, the evidence in the record supports the jury's finding that Murrah held Mascorro's hands behind her back and caused her to bend over while she was partially clothed and that he spanked or struck her with his hand on her bare buttocks. And the jury could have inferred from the evidence that Murrah knew this conduct was unlawful. *See Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009) (stating that circumstantial evidence is reviewed under the same standard as direct evidence). Therefore, we conclude that the evidence is legally sufficient to support Murrah's conviction for official oppression as alleged in paragraphs 3 and 4 of the indictment, and we overrule his third issue.

## V. Conclusion

Having sustained Murrah's first, second, and fifth issues and overruled Murrah's remaining dispositive issue, we reform the trial court's judgment to delete paragraphs 8 and 9 and to reflect his conviction for "official oppression (paragraphs three and four)." We affirm the trial court's judgment as reformed.

PER CURIAM

PANEL: MCCOY, J.; LIVINGSTON, C.J.; and GABRIEL, J.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: March 10, 2011